TERRY D. PARENTI *et al.*, Plaintiffs-Appellees and Cross-Appellants, *v.* WYTMAR & COMPANY, INC., Defendant-Appellant and Cross-Appellee.

First District (1st Division)   Nos. 62684, 62986 cons.

Opinion filed May 9, 1977.—Supplemental opinion filed on denial of rehearing June 27, 1977.

Stephen C. Sandels and Robin G. Munden, both of Chicago (McDermott, Will & Emery, of counsel), for appellant.

Keck, Cushman, Mahin & Cate, of Chicago (James T. Otis and George E. Weaver, of counsel), for appellees.

Mr. JUSTICE SIMON delivered the opinion of the court:

The plaintiffs, Parenti and Jacobs, are former employees of the defendant, Wytmar & Company, Inc. (Wytmar Co.). Each filed a separate action against Wytmar Co. claiming compensation owed for their 1970 services, and in case of Parenti, payment for his vested interest in a profit-sharing plan. The actions were consolidated for trial. The circuit court entered judgment in favor of both plaintiffs for compensation for their services, but in a smaller amount than claimed by each plaintiff. It did not credit each plaintiff's annual guaranteed salary against the compensation it awarded them, as Wytmar Co. contended

should have been done. It allowed Parenti his interest in Wytmar Co.'s profit-sharing plan, and awarded both plaintiffs prejudgment statutory interest on the compensation for their services. Wytmar Co. appeals from the judgments awarded plaintiffs, and plaintiffs cross-appeal contending that the judgments relating to their 1970 compensation were insufficient in amount.

Each plaintiff had a written employment agreement with Wytmar Co. Parenti's employment commenced October 1, 1964, and his employment agreement was executed on December 17, 1964. Jacobs' employment agreement was executed on March 2, 1970, the day his employment began. Each agreement stipulated it contained the entire agreement of the parties and could be changed only by a written agreement signed by the party against whom the change was sought.

Wytmar Co. was a "headhunter" or executive search firm; it located people to fill its clients' executive and management positions. Most of Wytmar Co.'s clients were industrial organizations, although businesses, educational institutions and governments could also use Wytmar Co.'s services. Parenti and Jacobs, Phillip Conway and George Hall, whom Jacobs replaced, all performed search and recruiting assignments for Wytmar Co.

In January 1966, while Parenti was an employee of Wytmar Co., but more than 4 years before Jacobs' employment commenced, Wytmar Co. initiated a "Compensation Plan" providing that each recruiter receive a guaranteed salary (base salary) and be credited with a commission of 25 percent of the fee collected by Wytmar Co. on each of his completed search assignments. At the end of the year, he would be paid the amount by which such commissions exceeded his base salary.

In 1969, Wytmar Co. entered into its first government contract with the Office of Economic Opportunity (OEO). Wytmar Co. was obligated to complete between 72 and 90 personnel searches to fill positions with community-action agencies throughout the country, to provide these agencies with training and technical assistance and to develop a manual. Wytmar Co. was not compensated on the basis of a percentage of the guaranteed first-year compensation for the positions filled as in its commercial business. Instead, the OEO contract was set up on a cost-plus-profit basis, and compensated Wytmar Co. with a single lump-sum figure. Wytmar Co.'s compensation was not contingent on placement of individual employees.

The OEO contract provided for a $143,220 total payment to Wytmar Co., and it contained a schedule showing how the figure of $143,220 was arrived at. This figure included compensation of $54,000 for "professional staff for two staff members." This latter amount is the principal basis for the controversy before us.

Parenti testified that Richard J. Wytmar, the corporation's president and sole stockholder, told him that the $54,000 would be set aside as further compensation for the three staff recruiters (at that time Parenti, Conway and Hall), and that the compensation for OEO searches would be in addition to the total commissions the staff would receive for commercial assignments. Mr. Wytmar denied making such statements. In any event, each staff recruiter, including Parenti, was paid $600 for each OEO search he conducted in 1969. This figure was reached by dividing the maximum number of searches required under the OEO contract, 90, into the $54,000 "professional staff" allocation. The $600 payments to the staff were reflected in the 1969 year-end compensation recaps Wytmar Co. prepared and gave to Parenti, Conway and Hall. At this time, $6,600 of the $54,000 was paid to Parenti, Conway and Hall, leaving an undistributed balance of $47,400.

Parenti and Jacobs contended that late in 1970, after Hall had left the company and 68 searches had been completed, they recommended to Mr. Wytmar that he divide the $47,400 among them and Conway. Their recommendation was a division based on the number of searches each conducted. They also recommended reserving $10,332 to compensate Hall for 12 searches he conducted in 1970 and setting aside a fund of $3,444 to cover four searches necessary to reach the minimum figure of 72 required by the OEO contract. This meant the compensation for each search after 1969 would be $861. They further recommended that if Hall did not receive the funds earmarked for him, these funds should be split equally among the three. Mr. Wytmar rejected this suggestion. The substance of plaintiffs' testimony was that in various 1970 meetings Mr. Wytmar acknowledged that the $47,400 amount was to be divided among the recruiters, while Mr. Wytmar denied telling anyone they were entitled to the entire fund.

In early January 1971, Parenti, Jacobs and Conway resigned because of disagreement with Wytmar Co. over the compensation for their OEO searches. Shortly thereafter, Wytmar Co. gave Parenti and Jacobs work sheets listing their 1970 earnings. These sheets showed compensation of $600 for each OEO search plus commercial commissions, and their base salary was subtracted from that total. Plaintiffs rejected them as inaccurate and unacceptable because the work sheets: (i) did not allocate all remaining OEO staff funds among the recruiters on the basis of the number of searches they conducted; (ii) applied the base salary deduction to the total of the OEO commissions and sums due for commercial searches instead of adding the OEO commissions to the base salary; (iii) credited Jacobs and Parenti with 16 and 10 OEO searches respectively rather than the 18 and 11 they claimed.

Some time before trial, Conway compromised his claim against

Wytmar Co., accepting $9,786 as compensation for his OEO searches. Plaintiffs claimed this left $37,614 in the fund ($47,400 minus $9,786). Apparently because nothing has been paid to Hall, plaintiffs claimed at trial that they were entitled to have the entire remaining fund, $37,614, allocated between them on the basis of the number of searches each completed, or $1,297.03 per search. The circuit court found that they were entitled to $600 per completed OEO search, and that Jacobs had completed 18 and Parenti 11.

In computing the amounts owing to Parenti and Jacobs for OEO searches, the circuit court did not set them off against their base salaries, as Wytmar Co. contends the Compensation Plan required. The evidence relating to this set-off or credit introduced by defendant established that Jacobs prepared a written tabulation computing his 1970 earnings which he presented to Mr. Wytmar. It added his commissions for commercial searches to the compensation he claimed for OEO work and credited his base salary for 1970 against that sum. The recaps furnished by Wytmar Co. to Parenti, Conway and Hall for their 1969 earnings also were computed in this fashion. Mr. Wytmar testified that the amounts a recruiter received for OEO searches were to be added to his other earnings and set off against the base salary.

Jacobs testified that both before and after his written employment agreement was executed, Mr. Wytmar several times told him he would be paid for any OEO work he did. Mr. Wytmar acknowledged that when Jacobs accepted employment he told Jacobs he would receive a $2,000 guaranteed annual bonus. Jacobs' written employment agreement referred neither to this bonus, nor to compensation for OEO searches.

Parenti was a participant in Wytmar Co.'s noncontributory profit-sharing plan. When he resigned his interest in the plan was $4,625.94 plus accrued interest. The plan provided that if within 3 years following an employee's termination for reasons other than by retirement, he was employed by a competitor of the company or performed any other action in competition with or detrimental to the business of the company, the balance in his profit-sharing account would be subject to forfeiture.

After Parenti and Jacobs left Wytmar Co., they formed their own search firm. Mr. Wytmar testified that 70 to 80 percent of Wytmar Co.'s clients were in Cook, Du Page and Lake Counties, Illinois, and that Wytmar Co. conducted searches for Wabash Magnetics and Millprint Inc. during Parenti's employment. Parenti testified that the search firm he and Jacobs owned was similar to Wytmar Co., and that it was located in the counties Wytmar Co. named as the major source of its business. He stated that in the year after leaving Wytmar Co., he and Jacobs conducted searches for subsidiaries of Wabash Magnetics and Millprint Inc. Wytmar Co. contends that Parenti engaged in competition with Wytmar Co.

within 3 years following termination of his employment and so forfeited all his interest in the profit-sharing plan. The circuit court entered judgment for Parenti for his share in Wytmar Co.'s profit-sharing plan, and accrued interest, a total of $4,848.

The circuit court awarded plaintiffs' prejudgment statutory interest on their claims for breach of Wytmar Co.'s agreement to pay commissions for the OEO searches. Plaintiffs contended they were entitled to interest because Wytmar Co. unreasonably and vexatiously delayed payment of their compensation for these searches and also because this compensation was money due in liquidated amounts on a settlement of account. Ill. Rev. Stat. 1975, ch. 74, par. 2.

The issues presented by this appeal and plaintiffs' cross appeal contending they were entitled to compensation of $1,297.03 for each OEO search are whether: (i) the court's holding fixing plaintiffs' recovery at $600 per OEO search was against the manifest weight of the evidence; (ii) the court erred in computing the amounts owing to plaintiffs for OEO searches by failing to add such amounts to other commissions earned by plaintiffs and deducting their respective base salaries from the total; (iii) the parol evidence rule barred Jacobs from claiming compensation for OEO searches; (iv) Parenti's conduct justified forfeiture of his vested interest in Wytmar Co.'s profit-sharing plan; and (v) the award of statutory interest was proper.

■■ Mr. Wytmar's and plaintiffs' testimony about plaintiffs' rights to compensation for their OEO searches cannot be reconciled. Mr. Wytmar denied promising plaintiffs any compensation for this work, while plaintiffs claim he promised to pay them all amounts left out of the $54,000 allocated for "professional staff for two staff members." Since in 1969 all Wytmar Co. employees were compensated on the basis of $600 per search for each OEO search, the trial judge's conclusion that in 1969 Parenti and Wytmar Co. orally agreed to compensation on this basis and that they agreed to continue this arrangement for 1970 was not against the manifest weight of the evidence. Notwithstanding Parenti's written employment agreement requiring that changes be in writing signed by the parties, Parenti and Wytmar Co. were at liberty to modify this requirement by a subsequent oral agreement such as the one the circuit court found to exist with respect to additional compensation for OEO searches. *Shanesy v. Ford Motor Co.* (N.D. Ill. 1946), 7 F.R.D. 199; *John Kubinski & Sons v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529; 3 Corbin, Contracts §574 (1960).

■■ Wytmar Co. attacks Jacobs on another ground, contending they discussed Jacobs' compensation for OEO searches before the execution of a written employment agreement, and that the written agreement contained no provision for compensation for such searches. Wytmar Co.

relies on the rule that where the parties to a contract have put their agreement in writing, parol evidence of prior or contemporaneous agreements is not competent. This principle, however, is inapplicable where it appears that a written instrument was not intended to incorporate the entire agreement between the contracting parties. In that event, a separate parol agreement not inconsistent with the terms or legal effect of a written agreement and relating to a matter on which the written instrument is silent can properly be received in evidence. *Fuchs & Lang Manufacturing Co. v. R. J. Kittredge & Co.* (1909), 242 Ill. 88, 89 N.E. 723; *Farnsworth v. Lamb* (1972), 6 Ill. App. 3d 785, 286 N.E.2d 74; 9 Wigmore, Evidence §2431 (3d ed. 1940).

Jacobs' testimony regarding what Mr. Wytmar told him about payment for OEO searches, as well as Parenti's and Conway's testimony that an agreement had been reached with Wytmar Co. for extra compensation to Wytmar Co.'s employees for OEO searches, strongly support Jacobs' contention that the written agreement was not intended to cover his entire employment arrangement with Wytmar Co. Also, Mr. Wytmar conceded that although the written agreement provided Jacobs was to receive a salary of $18,000, he had promised Jacobs a guaranteed $2,000 annual bonus not reflected in the written agreement. The written agreement is silent about OEO searches and compensation for Jacobs' services implementing the OEO contract. In receiving parol evidence regarding payment to Jacobs for the OEO searches, the circuit court must have determined that neither Jacobs nor Wytmar Co. intended to incorporate their entire understanding in the written employment agreement. This determination was not against the manifest weight of the evidence; consequently, Jacobs' testimony concerning his conversations with Mr. Wytmar about his compensation for OEO searches was properly received.

■■ On awarding plaintiffs $600 for each OEO search, the circuit court failed to add that compensation to commissions for commercial searches earned by each plaintiff, and credit against that sum each plaintiff's base salary for 1970. In other words, the court treated the compensation for the OEO searches as separate from and in addition to the base salary each plaintiff received under Wytmar Co.'s Compensation Plan. In so overlooking a credit which the manifest weight of the evidence required, the circuit court erred. The result of this error was that the judgment entered for Jacobs was $7,721, and that for Parenti $346, greater than if the credit had been taken into account.

The tabulation prepared by Jacobs and admitted in evidence reflected his understanding of how his 1970 compensation was to be computed. It deducted his base salary from the total compensation he received for commercial commissions and OEO searches in 1970. Parenti's recap

sheet, prepared by Wytmar Co. and covering Parenti's 1969 compensation, was computed on the same basis as was that of Hall, whom Jacobs replaced.

The testimony of their own witness, Conway, also casts serious doubt on plaintiffs' contention that their OEO compensation was to be added to their base salaries. His direct, cross and redirect examination testimony was ambiguous. But, on his re-cross-examination, he clearly and unequivocally stated his understanding that the compensation for OEO searches was to be added to commercial commissions and that the base salary then would be credited against this total in computing the annual compensation for Wytmar Co.'s employees. Thus, the judgment entered for the amount by which each plaintiff's total earnings exceeded his base salary.

Next, we review Parenti's right to recover his interest in the profit-sharing plan. His position is that he was not guilty of conduct justifying forfeiture under the plan. He also contends that even if he did compete with Wytmar Co., forfeiture of his interest in the profit-sharing plan for that reason is in restraint of trade and unreasonable *per se*, and as a matter of public policy should not be permitted by Illinois courts. So far as we are aware, Illinois reviewing courts have not announced the law of this State on this subject. *Van Pelt v. Berefco, Inc.* (1965), 60 Ill. App. 2d 415, 208 N.E.2d 858, while dealing with the subject, applied Massachusetts rather than Illinois law. *Isabelli v. Curtis 1000, Inc.* (1975), 31 Ill. App. 3d 1030, 1040, 335 N.E.2d 538, skirted the question, but did not decide whether a forfeiture clause in a retirement trust is enforceable. *Johnson v. Country Life Insurance Co.* (1973), 12 Ill. App. 3d 158, 300 N.E.2d 11, although advanced by Parenti as a compelling authority, merely decided that forfeiture of renewal premiums would not be enforced because the geographical area delineated in the forfeiture provision was too broad. It did not deal with the validity of a forfeiture provision in a profit-sharing plan which came into operation when a person commenced competing with his former employer. Similarly, an examination of *Neuffer v. Bakery & Confectionery Workers International Union* (D.C. Cir. 1962), 307 F.2d 671, relied on by Wytmar Co., discloses that its conclusion that a retired employee's vested interest in a pension plan may be divested if after retirement he competes with his former employer was not based on any Illinois holding on that subject.

However, in deciding whether Parenti is entitled to his interest in the profit-sharing plan, it is unnecessary to consider whether as a matter of Illinois law forfeiture of an interest in such a plan if an employee after termination competes with his former employer is valid. The reason is that the evidence does not support the conclusion that Parenti competed with Wytmar Co. or acted to the detriment of that company.

■■■ Forfeitures are permitted only where the right to forfeiture is shown clearly and unequivocally. (*Isabelli v. Curtis 1000, Inc.* (1975), 31 Ill. App. 3d 1030, 1039, 335 N.E.2d 538; *Richards v. Liquid Controls Corp.* (1975), 26 Ill. App. 3d 111, 325 N.E.2d 775.) And, because a forfeiture is involved, the language on which the claimed forfeiture is based should be strictly construed against Wytmar Co., which promulgated the profit-sharing plan and now is seeking the forfeiture. Moreover, such plans are to be liberally construed in favor of the employee. (*Anger v. Bender* (1975), 31 Ill. App. 3d 877, 880, 335 N.E.2d 122.) The key words of the profit-sharing plan provide for forfeiture where a former employee is employed by a competitor of Wytmar Co. or performs any other action in competition with or detrimental to the business of Wytmar Co. As we construe this language, it requires that the competition offered by a former employee be substantial, real, tangible and continuous and that it deprive Wytmar Co. of business that Wytmar Co. can establish it would have received in the absence of such competition. Competition which is insubstantial, isolated or speculative, which does not involve business with present customers of Wytmar Co., and which does not take advantage of any trade secrets or confidential customers' lists does not qualify as conduct justifying a forfeiture of a former employee's interest in the profit-sharing plan.

■■■ That Parenti and Jacobs merely operated a search firm in the same geographic area as Wytmar Co. did not run afoul of the prohibition of the profit-sharing plan. Cook, Lake and Du Page Counties in Illinois constitute one of the most active business areas in the United States. Because of the large number of companies in that area requiring executive talent, it is entirely possible for two firms in that vast reservoir of activity to engage in the same business without ever vying with each other for the same customers or the same executives.

The evidence establishes only that Parenti and Jacobs performed searches for subsidiaries of two companies for which Wytmar Co. had conducted searches while employing Parenti. Parenti was employed by Wytmar Co. for 6 years. Wytmar Co. did not show when during Parenti's employment it conducted searches for the two parent corporations. It failed to prove that it ever conducted searches for the subsidiaries that Parenti and Jacobs served, that these subsidiaries or their parent corporations still were Wytmar Co. customers when Parenti and Jacobs had contact with them, or that Wytmar Co. was soliciting the business of these subsidiaries or their parent corporations when Parenti and Jacobs were engaged to conduct searches for the subsidiaries. Because the record is devoid of such facts, the conclusion that Parenti was not "employed by a competitor of" Wytmar Co. and that he had not "performed any other action in competition with or detrimental to the business of" Wytmar Co.

is not against the manifest weight of the evidence. In seeking a forfeiture, Wytmar Co. failed to carry the burden of establishing clearly and convincingly that real, substantial and meaningful competition existed between Wytmar Co. and Parenti and Jacobs after Parenti left Wytmar Co. The circuit court properly found, therefore, that Parenti was entitled to his interest in the profit-sharing plan plus accrued interest.

■■ The final issue is whether the court properly awarded plaintiffs prejudgment interest on the compensation it allowed them for OEO searches. The amount to be paid for OEO searches was a matter of dispute between the parties until fixed by the circuit court. Even after the circuit court's finding the plaintiffs cross appealed, claiming they were entitled to more than $600 per search. *Hamilton v. American Gage & Machine Corp.* (1976), 35 Ill. App. 3d 845, 852-54, 342 N.E.2d 758, is a complete authority for the conclusion that under the circumstances prevailing here Wytmar Co.'s conduct cannot be characterized as causing unreasonable and vexatious delay of payment. It is unnecessary to repeat that opinion's clear and sound review of the statutory authority for allowance of interest.

Nor are the plaintiffs entitled to prejudgment interest under the provision of the statute (Ill. Rev. Stat. 1975, ch. 74, par. 2) relating to monies due on settlement of account. When plaintiffs resigned, Wytmar Co. submitted a statement of what they were owed to them, but plaintiffs themselves objected to and rejected it.

The judgment in favor of plaintiff Jacobs in the amount of $10,800 is reduced to $3,079.58 and, as so reduced, is affirmed. The judgment in favor of plaintiff Jacobs in the amount of $2,588 for statutory interest is reversed. The judgment in favor of plaintiff Parenti in the amount of $6,600 is reduced to $6,254.10 and, as so reduced, is affirmed. The judgment in favor of plaintiff Parenti in the amount of $1,582 for statutory interest is reversed. The judgment in favor of Parenti in the amount of $4,848 as payment of his vested interest in the profit-sharing plan together with accrued interest is affirmed.

Judgments modified in part, affirmed in part and reversed in part.

GOLDBERG, P. J., and O'CONNOR, J., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE SIMON delivered the opinion of the court:
■■ Plaintiff Jacobs has petitioned for rehearing of this court's determination that his employment agreement provided for computing

his compensation by adding his commissions for commercial searches to his compensation for OEO searches and deducting his annual base salary from that sum. The circuit court decided in favor of Jacobs, holding that under his employment arrangement his compensation for OEO searches was not to be included in the amount against which his base salary was credited. Jacobs contends that the circuit court's conclusion is supported by the manifest weight of the evidence, and should not be disturbed even if there is evidence justifying an opposite result. Because of the testimony of Jacobs' witness, Phillip Conway, as well as Jacobs' own testimony and a tabulation prepared by Jacobs toward the end of 1970 which was received in evidence, we disagree with the suggestion that the circuit court's conclusion is supported by the manifest weight of the evidence. This testimony and the tabulation lead to the opposite conclusion.

On re-cross-examination, Jacobs' coworker, Conway, testified:

"Q. Mr. Conway, isn't it correct that in 1969, the manner by which your bonus was computed was as follows: your total commissions on commercial work was added to adjustments consisting of O.E.O. bonus. Those two figures were added together, and then from that figure was subtracted your base salary, is that correct?

A. Yes.

Q. * * * Your base salary was what, $19,000?

A. I think it was at that time.

Q. Was it your understanding that if your commercial searches had been entitling you to $6,000, and your O.E.O. searches amounted to $6,000, adding up to $12,000, that you would get anything more than your $19,000 at the end of the year?

A. No, I don't think so."

Jacobs contends that even if this testimony, as the opinion states, casts serious doubt on Jacobs' contention that his OEO compensation was to be added to his base salary, under the manifest weight test such doubt does not warrant reversal. Conway's testimony does more than raise serious doubt. It directly contradicts Jacobs' contention, and Jacobs is, of course, bound by the testimony of his own witness. Conway's clear and definite response to the questions posed in the final testimony he gave cannot be interpreted as Jacobs urges, as merely raising a conflict with other portions of Conway's testimony. His testimony on re-cross-examination clarified his previous testimony and established the terms of the arrangement under which he and Jacobs were employed.

The tabulation prepared by Jacobs and referred to in the opinion demonstrates that Jacobs understood his compensation was to be computed in precisely the manner Conway described in the testimony quoted above. The second page of the tabulation reads:

| | |
|---|---:|
| Total Commissions Earned | $ 8,946.34 |
| Adjustments: OEO T & T/A payment | $16,630.00 |
| Total Earned | $25,576.25 |
| Less: Base salary paid during 1970 | $16,666.67 |
| Bonus Due | $ 8,909.58 |

This computation was the subject of the following testimony by Jacobs on cross-examination:

"Q. * * * On the basis of your understanding with Mr. Wytmar that your commissions for OEO searches would be in addition to your base salary, I will ask you now why, in the computation that you prepared, you subtracted your base salary from the total of your commercial commissions and your OEO commissions?

A. Mr. Weaver, I don't recall.

Q. * * * How much do you now claim is owing to you for work performed under the OEO contract?

A. Something in excess of $23,000. I think it's $23,400.

Q. * * * I ask you not what has happened since the time you prepared that document which shows a bonus due of $8,909.85, and today's date, at which time you claim $23,000 is owing to you? What has happened between the date you prepared that document and today's date to increase that figure by something?

A. There was $36,000 left in the contract to be allocated to the staff after settlement with Mr. Conway, and that has changed my figure.

Q. The settlement to Mr. Conway?

A. That's correct."

The tabulation set forth above and Jacobs' testimony relating to it contradict other portions of this testimony in which Jacobs stated he understood Mr. Wytmar was telling him his base salary would not be set off against his OEO earnings. They demonstrate Jacobs' understanding during the period of his employment. His true understanding is also shown by Jacobs' inability to explain satisfactorily the inconsistency between the computation the trial court approved and the tabulation he prepared, which includes OEO payments in the amount from which the base salary is deducted.

Jacobs, in his petition for rehearing, also directs this court's attention to another tabulation he prepared regarding the earnings he was to receive pursuant to the OEO contract. That tabulation was concerned only with the compensation to be paid for OEO searches; it does not prove that such earnings were not to be included in the amount against which his base salary was to be offset.

The circuit court's decision which offset the base salary against an amount which did not include compensation for OEO searches is against the manifest weight of the evidence, and the petition for rehearing is, therefore, denied.

GOLDBERG, P. J., and O'CONNOR, J., concur.